**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KIMBERLY GORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 3:11-cv-00808** |
| | ) | **Judge Nixon** |
| **v.** | ) | **Magistrate Judge Bryant** |
| | ) | |
| **CHARDONNAY DIALYSIS, INC.,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Pending before the Court is Defendant Chardonnay Dialysis, Inc.'s Motion for Summary Judgment ("Motion") (Doc. No. 25), filed along with a Memorandum in Support (Doc. No. 25-1), a Concise Statement of Undisputed Facts (Doc. No. 27), and multiple exhibits (Doc. Nos. 28-1 to 28-13). Plaintiff Kimberly Gore has filed a Response in Opposition (Doc. No. 32-1), along with a Response to Defendant's Concise Statement of Undisputed Facts (Doc. No. 32-5), a Statement of Additional Material Facts (Doc. No. 33-1), and multiple exhibits (Doc. Nos. 32-2 to 32-4 & 33-2 to 33-4). Defendant has filed a Reply (Doc. No. 34), along with a Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 35). For the reasons given herein, Defendant's Motion is **DENIED**.

## I.    BACKGROUND

### A.  *Factual History*[1]

Defendant is a dialysis company based in Danville, Illinois. Defendant supplies dialysis services to inmates in state and federal prisons throughout the United States, including the

---

[1] The facts in this section are undisputed and taken from Plaintiff's Response to Defendant's Concise Statement of Undisputed Facts (Doc. No. 32-5) and Defendant's Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 35), unless otherwise noted.

1

DeBerry Special Needs Facility ("DeBerry") in Nashville, Tennessee, previously known as the Tennessee Hospital for the Criminally Insane. Plaintiff served as a Clinical Nurse Manager at DeBerry from approximately September 6, 2001 to August 2, 2010. During her employment at DeBerry, Plaintiff generally received positive evaluations and feedback regarding her work. Her "major duties" as Clinical Nurse Manager included maintaining a professional demeanor at all times, maintaining open communications with Tennessee's Department of Correction ("TDOC" or "DOC") and Defendant's management and staff, and reporting any incidents that were "out of the norm" to Regional Director Stacy Vice.

On August 2, 2010, Plaintiff was terminated in person at DeBerry by Ms. Vice and Nicole Vandevander, Defendant's National Clinic Manager. This lawsuit concerns a series of incidents that occurred in the months prior to her termination, which the Court summarizes in the following two subsections.

### 1. Discovery of Substance on June 21, 2010

The first set of events relevant to this lawsuit began on Monday, June 21, 2010, when Plaintiff smelled and observed a substance in a cabinet under a sink within the dialysis unit. Plaintiff feared at that time that the substance was black mold; however, she was not qualified to determine what the substance was. Plaintiff reported her discovery of the substance to Defendant's National Technical Director, Martin Geer. Mr. Geer told Plaintiff that he would report the substance to the appropriate individual with Defendant, which Mr. Geer did. He also encouraged and directed Plaintiff to bring the problem to the attention of appropriate officials at DeBerry, telling Plaintiff to go "to the powers in charge" and "find out . . . what they're going to do about this." Plaintiff replied to Mr. Geer that she could approach Sergeant Darrell Thomas about the situation; Mr. Geer indicated that he thought that was a good idea. Plaintiff told Mr.

Thomas about the substance, and Mr. Thomas then informed DeBerry's Chief Sanitation Officer, Charles Branson, about the substance. Mr. Branson appeared at the dialysis unit in less than an hour.

Mr. Branson's first job with TDOC was as a first-level correctional officer, and, to become a sanitation officer, Mr. Branson completed an eight-hour training session on "general cleaning practices," but received no training in Occupational Safety and Health Administration ("OSHA") procedures or collecting mold samples. Mr. Branson immediately "determined" that the substance was a combination of dirt, rust, and calcium, and not black mold. Mr. Branson testified that he made this determination based on "life experience" and "living on [his] own and repairing [his] own plumbing." Mr. Branson also testified that he was "pretty much a glorified janitor" and that his impression of his role in this situation was that there was "a mess" and it was his job to "come clean it up."

Plaintiff testified that, on the evening of June 21, 2010, the day on which she discovered the substance, she prevented two employees, Bob Duke and Melinda Davidson, from entering the clinic, as a result of her conversation with Mr. Geer. The DeBerry dialysis unit did not treat patients on Tuesdays and Thursdays, so no treatments were cancelled or needed to be cancelled on June 22 or June 24, 2010.

Subsequent to Mr. Branson observing the substance, Health Services Administrator Tim McConnell, Assistant Health Services Administrator Tammy Farley, and Physicians' Assistant David Sehorn (who had undergraduate degrees in Chemistry and Biology as well as a Masters Degree in Biology) all concluded that the substance was some combination of dirt, rust, calcium, and leaking from a p-trap that had built up under the sink, not black mold. Mr. McConnell, whose background is in hospital administration, testified that he believed the substance to be

"rust," just "from looking at [the substance]."  Ms. Farley, whose background is in nursing and hospital administration, testified that she came to the conclusion that the substance was not black mold because she had "looked" at the substance.  Plaintiff was not aware that these three individuals observed the substance or made any "conclusions" as to its organic make-up; she was only aware of Mr. Branson's observation and opinion.

The parties dispute whether any samples were taken of the substance.  Plaintiff testified that she provided three sterile culture Q-tips to Mr. Branson for the purposes of obtaining a sample, and Mr. Thomas testified that he remembered Mr. Branson saying "let me just send it to the lab or something just so you can be sure that it was just some rust on the pipes."  However, Defendant disputes that any sterile samples were taken, and Mr. Branson denied that he ever took samples of the substance, told Plaintiff that he would test samples of the substance, and that he had a conversation with Plaintiff in which he refused to test samples of the substance.  Plaintiff, however, testified that on June 23, 2010, Mr. Branson told Plaintiff that samples of the substance were on his desk, but he was not going to send them off.  Plaintiff also testified that she called Mr. Geer to tell him this information, and that he responded, "you need to find out from somebody what's going to be done . . . you need some confirmation that this is all okay." Mr. McConnell and Ms. Farley also denied that they took samples of the substance, and the two of them, in addition to Mr. Branson, denied being aware of anyone else taking samples of the substance.

Plaintiff alleges that she contacted Deputy Warden Debra Johnson and OSHA regarding the substance, but she has no record of doing so.  She testified that she called the Deputy Warden and spoke to the Deputy Warden's secretary, who responded, "Is this about the mold, your complaints about the mold? . . . if this is about the mold, Mr. McConnell's handling that."

4

Additionally, Plaintiff testified that she called OSHA and asked a woman "if she could send them a sample, could she do something, just to confirm that this is a safe environment." Plaintiff testified that the woman at OSHA responded no. Plaintiff alleges that she informed Ms. Vice and Mr. Geer that she contacted OSHA, but she has no record of having done so, and both Ms. Vice and Mr. Geer deny that Plaintiff so informed them.

Plaintiff testified that Mr. McConnell told her that the cabinets where the substance was originally seen had been scrubbed and bleached. However, Plaintiff testified that the odor she encountered when she first discovered the substance had returned to the dialysis clinic after the area had been scrubbed and bleached. Plaintiff testified that, sometime on June 23 or June 25, 2010, Mr. Branson came to the reverse osmosis room in the dialysis unit to see a substance on the inside of the baseboards that looked like the substance Plaintiff had seen under the sink on June 21, 2010. That same day, Plaintiff questioned Mr. McConnell about "a few things" related to the substance in the reverse osmosis room; the parties dispute whether Plaintiff was satisfied with his response. On Friday, June 25, 2010, Plaintiff sent a facsimile to Mr. Geer providing a timeline and detailed explanation of the events regarding the substance she discovered in the dialysis unit.

### 2. Reports Regarding Plaintiff's Conduct

The second set of events relevant to this lawsuit arises out of an audit of Plaintiff's unit that Defendant scheduled for July 7, 2010. As a result of this audit, Defendant contends that it received "a series of highly disturbing reports about [Plaintiff's] unprofessional conduct within her unit and her use of extremely poor judgment in certain managerial situations." Plaintiff disputes that she ever engaged in such conduct, though she admits that Defendant received such

reports.  In particular, Dwayne Phillips[2] provided information to Ms. Vandevander and Ms. Vice regarding Plaintiff.  This included a memo prepared by Monique Parris-Taylor, a dietician, that was given to Ms. Vice, which stated that Plaintiff "intentionally gave inmates the mis-impression that Ms. Parris-Taylor had some say over inmates or otherwise undermined Ms. Parris-Taylor's role as the facility's dietician"; Plaintiff admits that this language was in the memo, but disputes the validity of these assertions.  Defendant never counseled or asked Plaintiff about this incident prior to her termination.  Defendant maintains a practice and policy of counseling employees for alleged complaints and problems, and had counseled Plaintiff on the only two write-ups that existed in her personnel file, both of which occurred in 2004 and ceased to be an issue after that year.

Additionally, Defendant cites to a particular incident involving Plaintiff, Ms. Parris-Taylor, and an inmate, Inmate Wolfe, who was apparently in possession of reading material deemed contraband; the parties dispute nearly all of the details surrounding this incident and the consequences of it, including a meeting that Plaintiff had with the Deputy Warden about the incident.  It is undisputed, however, that this meeting with the Deputy Warden did not result in any disciplinary action and Plaintiff did not think it was an issue.  Moreover, Ms. Vandevander testified that she never asked Plaintiff about the incident with Inmate Wolfe.

Lastly, in late July of 2010, Ms. Davidson, a patient care technician for Defendant, informed Ms. Vandevander that Plaintiff had made a variety of sexually inappropriate comments to her; again, Plaintiff disputes the validity of these statements, but does not dispute that Ms. Davidson so informed Ms. Vandevander.  Ms. Vice testified that no one contacted Plaintiff about Ms. Davidson's complaints and that Ms. Davidson was the only person to have these complaints

---

[2] The parties appear to dispute Mr. Phillips's title and position with Defendant.  (*See* Doc. No. 35 at 14.)  Plaintiff has alleged, however, that he served as either a Regional Manager or a Regional Director at the time of Plaintiff's employment with Defendant in her Statement of Additional Material Facts.  (*See id.* at 11, 14.)

about Plaintiff. Further, Ms. Vandevander testified that she never discussed Ms. Davidson's complaints with Plaintiff, and no documents were ever created by Defendant's employees regarding these complaints.

3. Testimony Regarding Plaintiff's Termination

Though the parties dispute many of the issues regarding Plaintiff's termination, they have agreed to treat the testimony of several individuals regarding the termination as undisputed for the purposes of this Motion. Accordingly, the Court briefly summarizes these facts here.

Ms. Vice testified that the decision to terminate Plaintiff was based collectively on complaints made by Mr. Phillips, Mr. McConnell, Ms. Davidson, and Ms. Parris-Taylor. Mr. McConnell testified, however, that he was never of the opinion that Plaintiff was a "troublemaker" or a "loud-mouth," and that he never complained to Defendant about Plaintiff using the words "drama," "troublemaker," or "creating unsafe conditions." Mr. McConnell also testified that he was not aware of anything Plaintiff did while he was Health Services Administrator that would fit the description of (1) "unprofessional conduct exacerbating tension between inmates and the Department of Corrections staff and custody officers which could lead to safety issues within our work environment"; (2) "not following the proper chain of command[,] causing tensions between our Company, our Contractor and staff within the Department of Corrections"; and (3) "as a Unit Manager, failure to exercise control of improper communications in front of inmates within her unit." Mr. McConnell further testified that he was not aware of any complaints made to Defendant regarding Plaintiff by anyone, he did not make any complaints to Defendant about Plaintiff, and no one told him that they had made complaints to Defendant about Plaintiff. Lastly, Mr. McConnell testified that he was not aware of any kind of tension or problems that Plaintiff may have had with any of her employees, he

7

never received any information or complaint that Plaintiff had jeopardized the safety of any staff or inmate in any way, and that he was not familiar with anything regarding Plaintiff that would justify the correctional staff "walk[ing] her out of the facility, hav[ing] her surrender her ID badge and issu[ing] a lock out preventing her return."

Mr. Thomas testified that he never made any complaints about Plaintiff being dramatic and that he was not aware of Plaintiff acting in any way that "would affect the safety of inmates regarding this mold." He further testified that he was not aware of any prison policy that Plaintiff broke due to her handling of the situation with the substance in the dialysis clinic. Ms. Farley testified that she never saw Plaintiff engage in any action or activity that could be described as "(1) exacerbating tension between inmates and TDOC staff and custody officers which could lead to safety issues; (2) not following the proper chain of command, causing tension between our Company, our Contractor, and staff within the Department of Corrections; and (3) failing to exercise control of improper communication in front of inmates within her unit." Ms. Farley further testified that she never made complaints to Defendant about Plaintiff and never used the words "drama," "troublemaker," and "creating unsafe conditions" to describe Plaintiff, nor did she hear anyone else use those terms to describe Plaintiff.

Ms. Vice, who conducted Plaintiff's performance evaluations—the first of which she conducted in 2006—testified that no one in management would have a better idea of Plaintiff's work habits than she did. Ms. Vice categorized Plaintiff's 2006 work performance as "outstanding" and stated in her evaluation that Plaintiff: "was wonderful to work with"; was an "asset to [Defendant] as well as the patients she works with"; "has all the respect of all staff, patients, [Defendant's] personnel and DOC personnel"; and "is very good with running her unit according to [Defendant's] and DOC policies and procedures, and this in the day-to-day

8

operations of the unit." Ms. Vandevander testified that she was knowledgeable about Ms. Vice's performance reviews and did not have any problems with any of Ms. Vice's reviews.

## B. *Procedural History*

Plaintiff initiated this lawsuit in the Circuit Court for Davidson County on July 22, 2011. (Doc. No. 1-1.) Plaintiff alleges that Defendant violated the Tennessee Department of Health Rule 1200-08-32-.06(6)(b) ("Rule"), which requires that a dialysis clinic "be maintained in a safe, clean and sanitary manner." (*Id.* at 10 ¶¶ 99-101.) Plaintiff alleges that she was terminated "solely due to her refusal to remain silent regarding" violation of the Rule. (*Id.* at 11 ¶¶ 102-04.) Thus, Plaintiff pursues two claims against Defendant: first, a claim under the Tennessee Public Protection Act (TPPA), Tenn. Code Ann. §50-1-304 (*id.* at 11 ¶¶ 93-95[3]), and, second, alternatively, a claim for common law retaliatory discharge (*id.* at 11 ¶¶ 96-97). Defendant removed the case to federal court on August 23, 2011 on the basis of diversity jurisdiction. (Doc. No. 1 at 2-3.)

On July 3, 2012, Defendant filed the pending Motion (Doc. No. 25), along with a Memorandum in Support (Doc. No. 25-1), a Concise Statement of Undisputed Facts (Doc. No. 27), and multiple exhibits (Doc. Nos. 28-1 to 28-13). On August 3, 2012, Plaintiff filed a Response in Opposition (Doc. No. 32-1), along with a Response to Defendant's Concise Statement of Undisputed Facts (Doc. No. 32-5), a Statement of Additional Material Facts (Doc. No. 33-1), and multiple exhibits (Doc. Nos. 32-2 to 32-4 & 33-2 to 33-4). On August 9, 2012, Defendant filed a Reply (Doc. No. 34), along with a Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 35).

---

[3] Plaintiff appears to have mis-numbered the paragraphs in her Complaint listing her two causes of action, as the Factual Allegations portion of her Complaint ends on paragraph 104, whereas the following section, Count I, begins at paragraph 93. (*See* Doc. No. 1-1 at 11.) Thus, while the Court here cites to the numbers utilized by Plaintiff in the Causes of Action portion of her Complaint, it appears that the proper paragraph numbers for the two claims would be paragraphs 105 to 107 and paragraphs 108 to 109, respectively.

9

## II.    LEGAL STANDARD

Summary judgment is rendered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must demonstrate that the non-moving party has failed to establish a necessary element of that party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment will be granted if "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996). The movant has the initial burden of informing the district court of the basis of the summary judgment motion and identifying portions of the record which lack a genuine issue of material fact to support the non-movant's case. *See Celotex*, 477 U.S. at 323.

The non-moving party may not rest solely on the allegations in the complaint, but must delineate specific evidence that shows there is a genuine issue for trial. *See id.* at 324. A "mere possibility" of a factual dispute is not sufficient to withstand a properly supported motion for summary judgment. *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330-31 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). A dispute about a material fact is genuine if a reasonable factfinder could find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A party asserting or denying that a fact is genuinely disputed may support its position by (1) citing to particular parts of materials in the record, (2) showing that the materials cited by the opposing party do not establish the absence or presence of a genuine dispute, or (3) showing that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

All reasonable inferences are to be drawn in favor of the non-moving party and the evidence of the non-movant is to be believed. *Anderson*, 477 U.S. at 255. "Credibility

10

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." *Id.* If the court determines that a reasonable factfinder could not find for the non-moving party, summary judgment must be granted. *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233.

## III.  ANALYSIS

### A.  *TPPA Claim*

The TPPA "prohibits the discharge or termination of an employee for refusing to participate in or for refusing to remain silent about illegal activities." *Harman v. Univ. of Tenn.*, 353 S.W.3d 734, 735 (Tenn. 2011).  A TPPA claim consists of the following four elements:

> (1) the plaintiff's status as defendant's employee; (2) the plaintiff's refusal to participate in or remain silent about illegal activities; (3) the defendant employer's discharge or termination of the plaintiff; and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the defendant employer's discharge of the plaintiff.

*Id.* at 737.  The parties do not dispute the first and third of these elements; only the second and fourth of these elements are at issue in the present case.

In its Motion, Defendant argues that Plaintiff's TPPA claim fails, first, because Plaintiff cannot establish the second element of her claim because "there was never any toxic mold." (Doc. No. 25-1 at 7.)  Citing to the depositions of Plaintiff, Mr. Branson, Mr. McConnell, Ms. Farley, and Mr. Sehorn, Defendant argues that there is no definitive proof that the substance about which Plaintiff complained was, in fact, toxic mold.  (*Id.* at 7-11.)  As further support for its position, Defendant points to part of Plaintiff's deposition testimony to argue that Plaintiff "stopped having concern [*sic*] that the substance would cause harm to anyone" two days after she first noticed it, when Mr. Branson told Plaintiff that the area was safe.  (*Id.* at 9.)  Additionally,

Defendant argues that no "illegal activity" has occurred in this case, as a violation of the Rule is insufficient to amount to "illegal activity" under the TPPA. (*Id.* at 11-14.) Specifically, Defendant argues that Plaintiff "has not pointed to any civil or criminal sanctions to be placed upon" Defendant for alleged violation of the Rule. (*Id.* at 13.)

Plaintiff first responds by arguing that "Defendant misstates the standard for satisfying the second element of a claim for TPPA." (Doc. No. 32-1 at 5.) Specifically, Plaintiff asserts that she must only show that she had "reasonable cause to believe" that Defendant engaged in or would engage in illegal activity, not that Defendant had in fact engaged in such activity. (*Id.*) Further, Plaintiff cites to state court opinions justifying such a broad reading of TPPA on the grounds that "one of the purposes of the statute is to root out illegal activity in the workplace," and thus "to only extend protection to those employees who have waited until illegal activity has already been conducted and not also employees who seek to prevent illegal activity from taking place defeats such a purpose." (*Id.*) Accordingly, Plaintiff contends that she "is not required to prove that the substance she discovered was in-fact toxic; she only has to show that she had a reasonable cause to suspect that a law, regulation, or rule had been violated or would be violated." (*Id.*)

Plaintiff then argues that the opinions of Mr. Branson, Mr. McConnell, Ms. Farley, and Mr. Sehorn regarding the composition of the substance she observed should not be considered because their testimony is opinion testimony, which would require "scientific, technical, or other specialized knowledge" under the Federal Rules of Evidence. (*Id.* at 5-6.) Plaintiff argues that Defendant did not disclose these individuals, or any other individuals, as expert witnesses during discovery, and thus it would be improper to rely on the testimony each of them gave regarding the substance at issue in this case. (*Id.* at 6.) Additionally, Plaintiff asserts that she was unaware

that Mr. McConnell, Ms. Farley, and Mr. Sehorn viewed the substance, and she believed that Mr. Branson was the only other person who had viewed the substance. (*Id.* at 7.) Plaintiff contends that she knew that Mr. Branson did not send any samples of the substance to OSHA to be tested, and, because he was the only person she was aware had stated the substance was not mold, she was "certainly justified in maintaining reasonable cause to believe a law, regulation, or rule had been violated or would be violated." (*Id.* at 7-8.)

Next, Plaintiff disputes Defendant's interpretation of Plaintiff's testimony regarding the cessation of her concern regarding the unknown substance. Plaintiff quotes her testimony and argues that she "only states that she stopped having concerns about the odor itself," not "about whether the substance posted a harmful threat to patients and staff." (*Id.* at 8.) Rather, Plaintiff argues that she "never stopped having a concern about having the substance tested to determine its identity" (*id.*), and recounts multiple communications she had with Mr. Geer and Mr. Branson, among others, as well as efforts she made to reach OSHA or TOSHA directly (*id.* at 8-10). After these events, Plaintiff states that she felt that she was under "heightened scrutiny," and was informed a week later that an audit of her unit was going to be performed, which surprised Plaintiff because the unit was not due for an audit until August or September. (*Id.* at 10.) Plaintiff contends that it was during this audit that Ms. Davidson first informed Ms. Vice and Ms. Vandevander of the allegations Defendant raises in its Motion. (*Id.*)

As a final argument with respect to the "illegal activity" element of her TPPA claim, Plaintiff argues that the Rule at issue is indeed a regulation that can serve as the basis for a wrongful termination claim. (*Id.* at 10-12.) Plaintiff asserts that the Rule "is the creation of an administrative body created by Tennessee law," "[v]iolation of the [R]ule can result in the suspension or revocation of the license required to operate the dialysis clinic," and such a

suspension or revocation "is subject to judicial review in accordance with the Uniform Administrative Proceedings Act" in state court. (*Id.* at 11.)

In its Reply, Defendant reiterates its position that Plaintiff cannot identify the occurrence of any illegal activity because she "has failed to identify the law and policy that she contends was violated when TDOC did not send a sample of the substance to an outside lab for testing." (Doc. No. 34 at 2.) Defendant asserts that Plaintiff "must do more than simply state that she had reason to believe the actions were illegal." (*Id.*) Additionally, Defendant argues that "[e]very person [Plaintiff] notified either came to look at it themselves or notified the appropriate person who could, and did, rectify the situation." (*Id.* at 3.) As such, Defendant maintains that it "acted responsibly and within the scope of the law." (*Id.*) Finally, Defendant argues that Plaintiff has shown "no evidence that she was asked to participate in any activity and that she refused," a necessary part of this element of her claim. (*Id.*)

For the purposes of the second element of a TPPA claim, the statute defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). The Tennessee Supreme Court has stated that the TPPA's "protection extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated, and in good faith report it." *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997) (citation omitted). The "'illegal activity' or violation by the employer must implicate important public policy concerns," and thus an employee's refusal to participate in or remain silent about the illegal activity must "serve[] 'a public purpose that should be protected. So long as the employee's actions . . . seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged.'" *Williams v. Greater Chattanooga*

*Pub. TV Corp.*, 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011) (quoting *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 537 n.4 (Tenn. 2002)).

Before turning to whether Defendant has demonstrated that Plaintiff has failed to establish the second element of her claim, the Court first addresses Defendant's contention that Plaintiff must show that Defendant in fact engaged in illegal activity. Defendant cites to several cases to make such an argument. Defendant quotes *Collins v. AmSouthBank*, 241 S.W.3d 879, 885 (Tenn. Ct. App. 2007), for the following proposition: "Persons asserting either a statutory or common-law whistleblowing claim must prove . . . that their employer violated a law or regulation." (Doc. No. 25-1 at 7.) However, when viewed in context, it becomes clear that the *Collins* decision does not support the strict interpretation of the TPPA Defendant endorses. The relevant portion of *Collins* reads as follows:

> Persons asserting either a statutory or common-law whistleblowing claim must prove more than that their employer violated a law or regulation. They must prove that their efforts to bring to light an illegal or unsafe practice furthered an important public policy interest, rather than simply their personal interest. While they need not report the suspected illegal activities directly to law or regulatory enforcement officials, they must make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities.

241 S.W.3d at 885 (citations omitted). Thus, not only does Defendant omit important parts of the sentence it has quoted—words that, when reinserted, change the meaning of the sentence—but, taken as a whole, the Tennessee Court of Appeals, in this part of the *Collins* decision, appears to make an entirely different point altogether: that an employee's "efforts to bring to light an illegal or unsafe practice furthered an important public policy interest, rather than simply their personal interest," *id.*—not that there must be some *actual* violation of the law for a plaintiff to establish a TPPA claim.

Neither does Defendant's citation to *Hood v. Tennessee Board of Regents*, No. 3:04-0473, 2006 WL 2645197, at \*8 (M.D. Tenn. Sept. 14, 2006), support Defendant's argument. In the portion of *Hood* cited by Defendant (*see* Doc. No. 25-1 at 7), this Court merely reiterated the elements of a TPPA claim, citing to the statute itself:

> The requirements for making a *prima facie* case are twofold. First, the Plaintiffs must show that the activity they reported constituted a violation of the "criminal code of this State or the United States or any regulation intended to protect the public health, safety and welfare." Tenn. Code Ann. 50-1-304(b).

*Id.* As with *Collins*, the Court does not interpret this explanatory language as imposing a requirement that Plaintiff show that Defendant has *in fact* violated any laws or regulations.

Lastly, Defendant, in its Reply, cites to *Sanders v. Henry County*, No. W2008-01832-COA-R3-CV, 2009 WL 1065916, at \*8 (Tenn. Ct. App. Apr. 21, 2009), for the proposition that Plaintiff "must do more than simply state that she had reason to believe the actions were illegal." (Doc. No. 43 at 2.) Defendant summarized *Sanders* in a parenthetical as follows: "affirming summary judgment granted for employer where plaintiff's only assertions regarding alleged illegal activity were that he *thought* the employer's actions were wrong and court refused to extend *Mason* to cover the plaintiff's beliefs of wrongdoing." (*Id.*) Defendant's summary of *Sanders* is not incorrect; however, Defendant glosses over important details that led the court to that conclusion. The plaintiff in *Sanders* brought a TPPA claim on the grounds that he was terminated for reporting to the county mayor that he had observed his supervisor viewing pornography on an office computer. 2009 WL 1065916, at \*1, 6. He pointed to an "unsigned, undated 'use agreement'" and argued that the agreement constituted a regulation for the purposes of the TPPA. *Id.* at \*7. The court dismissed this argument for several reasons, including that there was no evidence that the agreement was used county-wide or in the office in which the

16

plaintiff was employed, there was nothing in the record to suggest that any of the parties signed the agreement, and the plaintiff testified that he did not know of the document's existence until after his termination. *Id.* The court also noted that the plaintiff did "not claim that he was aware of any law, regulation, or rule which he believed [his supervisor] was violating," and refused to find that *Mason* supported his view that simply believing that his supervisor's "actions were wrong" was sufficient for a TPPA claim. *Id.* at *8. Thus, *Sanders* does not support the idea that there must be an *actual* violation of the law for an employee to pursue a TPPA claim; rather, the case holds that the employee must do more than believe that the employer behaved wrongly in a general sense.

The Court now turns to the question of whether the Rule cited by Plaintiff is a sufficient basis for her TPPA claim. Defendant argues that it is not, as "regulations that are phrased as 'aspirational goals' and cannot be enforced in the same manner as a criminal or civil statute are . . . not good candidates to constitute 'illegal activity,'" and violation of the Rule does not result in any civil or criminal sanctions. (Doc. No. 25-1 at 12-14.) In support of this argument, Defendant cites to *Drake v. Bio-Medical Applications of Tennessee, Inc.*, No. 11-2554-STA-cgc, 2012 U.S. Dist. LEXIS 40956 (W.D. Tenn. Mar. 26, 2012), arguing that the court in *Drake* determined that the plaintiff's TPPA claim was based on such an "aspirational goal," and, as such, did not involve illegal activity for the purposes of the TPPA. (*Id.* at 12.) In *Drake*, however, the court explicitly noted that the Joint Commission's National Patient Safety Goal .01.01.01 was "not a statute or regulation," but rather "an aspiration promulgated by an independent non-profit organization." 2012 U.S. Dist. LEXIS 40956, at *19. By contrast, the Rule was promulgated by the Board for Licensing Health Care Facilities, part of the Tennessee Department of Health (*see* Doc. No. 28-1 at 2), and violation of the Rule can result in suspension

or revocation of a facility's license, *see* Health Dept. Rule § 1200-08-32-.03(1)(b); (Doc. No. 28-1 at 10).  Defendant's arguments that other considerations come into play before the Board will ultimately decide whether to revoke a facility's license, and thus Defendant faced no criminal or civil sanctions for its alleged violations (Doc. No. 25-1 at 14), are irrelevant, as it is clear that an entity in violation of the Rule faces the threat of actual and severe consequences from state regulators, and, as such, the Rule can in no way be considered a mere "aspirational goal."

Moreover, the Court finds that the Rule satisfies the requirement that it must be "intended to protect the public health, safety or welfare."  Tenn. Code Ann. § 50-1-304(a)(3).  The Rule reads as follows: "The physical environment of the clinic shall be maintained in a safe, clean and sanitary manner.  Any condition of the clinic site conducive to the harboring or breeding of insects, rodents or other vermin shall be prohibited.  Chemical substances shall not be stored with or near food or medications."  Health Dept. Rule § 1200-08-32-.06(6)(b).  Given that the Rule concerns the cleanliness of renal dialysis clinics, the Court finds that it quite clearly "serves 'a public purpose that should be protected'" and "'further[s] the public good.'"  *Williams*, 349 S.W.3d at 515 (quoting *Guy*, 79 S.W.3d at 537 n.4).  In sum, the Court finds Defendant's arguments as to this point to be without merit; the Rule can serve as the basis for Plaintiff's TPPA claim.

On a related note, to the extent that Defendant briefly argues, in its Reply, that Plaintiff has shown "no evidence that she was asked to participate in any activity and that she refused," a necessary part of this element of her claim (Doc. No. 34 at 3), the Court finds this argument to be meritless.  The Tennessee Supreme Court has explicitly stated that the TPPA's second element "does not require a showing that the employer instructed the employee to refrain from reporting the illegal activity" in question.  *Mason*, 942 S.W.2d at 476.

The question is now whether Defendant has established that there is no genuine dispute of material fact as to whether Plaintiff had a "reasonable cause" to believe that Defendant was in violation of the Rule. *Id.* at 472. The Court finds that Defendant has failed to do so. Plaintiff has provided a great deal of testimony regarding her actions following the discovery of the substance in question. Some of this testimony is disputed by Defendant, as other employees have provided different versions of these events.[4] However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." *Anderson*, 477 U.S. at 255. Accordingly, it would be inappropriate for the Court to determine, at this stage, whether Plaintiff's belief that Defendant was in violation of the Rule was "reasonable." As such, Defendant has failed to demonstrate that Plaintiff cannot, as a matter of law, establish this element of her TPPA claim. Therefore, the Court finds that there is a genuine dispute of material fact as to whether Plaintiff refused to participate in or remain silent about illegal activities under the TPPA. *See Harman*, 353 S.W.3d at 737.

The Court notes that the parties have also provided extensive argument as to the fourth element of Plaintiff's TPPA claim. (*See* Doc. No. 25-1 at 16-25; Doc. No. 32-1 at 13-23; Doc. No. 34 at 4-7.) Though the Court need not address these arguments about causation in detail, as Defendant's failure to meet its burden as to the second element is sufficient to deny the Motion with respect to Plaintiff's TPPA claim as a whole, the Court wishes to note that the parties rely extensively on witness testimony to argue their positions as to this fourth element. As with the

---

[4] To the extent that this testimony includes testimony from witnesses about the nature of the substance Plaintiff discovered, the Court shares Plaintiff's concerns that Defendant improperly relies on their testimony to definitively establish the nature of that substance because they are not qualified experts. (*See* Doc. No. 32-1 at 5-6.) The Court notes, however, that the disputes among the witnesses are not reserved to opinions about the nature of the substance; rather, the parties provide differing accounts about the events following the discovery of the substance. Wholly apart from the question of expert qualifications, therefore, the Court finds that such witness testimony would need to be evaluated at trial, rendering summary judgment inappropriate in this case.

second element, summary judgment would be inappropriate for this causal element, as such witness testimony would need to be evaluated at trial. *See Anderson*, 477 U.S. at 255.

In sum, the Court finds that there is a genuine dispute of material fact as to whether Plaintiff has established a TPPA claim. Accordingly, Defendant's Motion is **DENIED** insofar as it seeks dismissal of that claim as a matter of law.

B. *Common Law Claim*

A claim for common law retaliatory discharge in Tennessee contains four elements. To succeed on such a claim, a plaintiff must show the following:

> (1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Kinsler v. Berkline, LLC,* 320 S.W.3d 796, 800 (Tenn. 2010) (citations omitted). As with Plaintiff's TPPA claim, the parties focus their arguments on the final two elements, those that require a public policy violation and establishing causation between the employee's conduct and her termination. (*See* Doc. No. 25-1 at 14-16, 23-25; Doc. No. 32-1 at 12, 24-25.)

Judge Sharp has noted that the first three elements of a common law retaliatory discharge claim—all but the causation element—are "identical" to the equivalent three elements of a TPPA claim. *Riddle v. First Tenn. Bank,* No. 3:10-cv-0578, 2011 WL 4348298, at *11 (M.D. Tenn. Sept. 16, 2011). Thus, the Court need not discuss the parties' arguments in depth. The Court has already determined that there is a genuine dispute of material fact as to the illegal activity element of Plaintiff's TPPA claim. Since that element is treated identically for the purposes of Plaintiff's common law claim, this reasoning also serves as grounds to find that there is a

20

genuine dispute as to the third element of Plaintiff's common law claim. Defendant's Motion is, therefore, **DENIED** insofar as it seeks dismissal of Plaintiff's common law claim.

## IV.    CONCLUSION

In light of the above analysis, Defendant's Motion is **DENIED**.

It is so ORDERED.

Entered this _____16th_____ day of August, 2012.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT